**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| **ERIC LOMNICK,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  4:23-CV-00633-RDP** |
| } | |
| **MARTIN O'MALLEY,** } | |
| **COMMISSIONER, SOCIAL SECURITY** } | |
| **ADMINISTRATION,** } | |
| } | |
| **Defendant.** } | |

**<u>MEMORANDUM OF DECISION</u>**

Plaintiff Eric Lomnick brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). *See also*, 42 U.S.C. §§ 405(g) and 1383(c). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**I.      Proceedings Below**

Plaintiff filed his application for a period of disability, DIB, and SSI on November 23, 2020. (Tr. 135-37). In both applications, Plaintiff alleged a disability onset date of June 27, 2020. (*Id.*). The claims were denied initially on May 5, 2021, and upon reconsideration on November 3, 2021. (Tr. 163, 168, 175, 178). Plaintiff then requested and received a hearing before Administrative Law Judge Ben E. Sheely ("ALJ") on May 17, 2022; however, due to a lack of records, the hearing was continued until a later date. (Tr. 61-67, 182-83, 199). On September 1,

2022, a supplemental hearing was held before the ALJ. (Tr. 35-60). In his decision, dated September 16, 2022, the ALJ determined that Plaintiff has not been under a disability under §§ 216(i), 223(d), or 1614(a)(3)(A) since June 27, 2020. (Tr. 17-29). After the Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 20, 2023 (Tr. 1), that decision became the final decision of the Commissioner, and therefore a proper subject of this court's appellate review.

At the time of the supplemental hearing, Plaintiff testified that he was thirty-nine years old and had attended school through tenth grade. (Tr. 42). Plaintiff previously worked as a processor at a chicken farm, and a truss assembler for a building supply company. (Tr. 43, 56). Plaintiff alleges that he suffers from bipolar disorder, schizophrenia, and paranoia, which cause him to struggle with being around others. (Tr. 45, 50, 301). According to Plaintiff, he last worked in 2018 but has been unable to work since June 27, 2020. (Tr. 43, 266).

During the hearing, Plaintiff stated that he has been living at his father's house in Gadsden, Alabama since June 2022. (Tr. 48). He receives around $350 a month in food stamps. (Tr. 48). Plaintiff maintains that he cannot afford to get his medication due to the cost of doctor visits and his prescriptions. (Tr. 46). He smokes cigarettes and averages a pack and a half in less than two days, which he buys with money that his dad or brother gives him. (Tr. 47-48). Plaintiff states that he spends most of his day cleaning up around the house, taking care of the family's pets, and watching television. (Tr. 48). He washes the dishes, does laundry, and cuts the grass at his father's house. (Tr. 49). He is able to prepare his own meals and cooks dinner about two to three times a week. (Tr. 324).

Plaintiff complains that since he was involved in a car accident in 2017, he struggles with paranoia that someone is trying to kill him. (Tr. 50). He states that he hears voices in his head that

2

talk about death, which leads to fear of being around others for fear that they may hurt him. (Tr. 50, 53). In addition, he sees "shadowy figures" almost every night and believes that someone lives in his mother's attic. (Tr. 50-52). He suffers from tremors that cause his whole body to convulse, as well as high blood pressure. (Tr. 54-55). He no longer drives because of his paranoia and anxiety. (Tr. 325).

Plaintiff also complains that he has trouble focusing and managing stress, and that he suffers from irritability and has anger due to his disabilities. (Tr. 322, 324, 326-27). He states that he sets daily reminders on his phone to remind him to take his medicine, and that he is no longer allowed to use the stove or oven because he often forgets he is cooking. (Tr. 324). He struggles with sleeping, although when he does fall sleep he does not suffer from nightmares. (Tr. 51-54, 323). Further, he complains of trouble getting along with others because he "feel[s] like everyone is against [him]" and "think[s] the worst about people." (Tr. 326-27). As a result, he was once fired for walking out of a job after getting angry at coworkers. (Tr. 327).

Although Plaintiff testified during his hearing that he was clean from drugs, he admits to having used drugs and alcohol in the past. (Tr. 45, 371). As of 2020, he smoked marijuana daily. (Tr. 371, 500-01). He began using methamphetamines in 2017 and has previously used Ecstasy, although he maintains that he no longer uses either of those controlled substances. (Tr. 45, 371, 435). He admits to testing positive for amphetamines in November 2021, but states that he believes he was drugged by a friend. (Tr. 45). He also was treated in November 2021 for acute alcohol withdrawal, although he says he "really [is] not [a] drinker." (Tr. 46).

In September 2019, Plaintiff presented to Southeast Health with complaints of hearing voices in his head. (Tr. 371). Plaintiff told Dr. William T. Elkington that he had been hearing the voices for at least two months in the context of methamphetamine and marijuana use, but that the

voices had begun repeating the word "death" in the past twenty-four hours. (Tr. 371). Although

Plaintiff stated that the voices were not instructing him to hurt himself or others, he admitted that

he felt like the only way to "quiet the voices" was to consider suicide. (Tr. 371). Plaintiff stated

that although he was prescribed medication to help with his psychiatric issues, he had not taken

his medicine in several months. (Tr. 371).

Dr. Elkington admitted Plaintiff to a hospital for four days. (Tr. 372). Plaintiff tested

positive for amphetamines and THC and admitted to using methamphetamines the day before and

smoking marijuana almost daily. (Tr. 372). Dr. Elkington noted that although Plaintiff had very

subtle paranoia on direct questioning and his judgment and insight seemed slightly impaired due

to his mistrust, he overall appeared well-groomed, cooperative with good eye contact, and had fair

insight and judgment. (Tr. 372, 376). Dr. Elkington diagnosed Plaintiff with substance-induced

mood disorder and psychosis, severe methamphetamine and cannabis use disorders, personality

disorder, and PTSD. (Tr. 372). Dr. Elkington prescribed Plaintiff Depakote and Zyprexa during

his hospitalization but discontinued the Depakote after his discharge. (Tr. 372). At the time of his

discharge, Plaintiff was noted to be stable and denied any depression, suicidal or homicidal

ideation, or hallucinations. (Tr. 372, 382). Plaintiff was strongly counseled to attend rehab and

AA/NA meetings, and he indicated that he would try to do so. (Tr. 372).

In February 2020, Plaintiff reported again to SouthEast Health with complaints of suicidal

thoughts and fear that somebody was following him. (Tr. 396). He was examined by Dr. Kaycia

L. Vansickle and admitted to the hospital. (Tr. 397). Plaintiff admitted that he had not been taking

his psychiatric medicine for over a year. (Tr. 402). He complained of an inability to function

because of his anxiety and paranoia and stated that his anxiety was exasperated by living at his

mother's house. (Tr. 396). Plaintiff reported that he had been having difficulty falling asleep and

staying asleep, and that he had awoken the week before with the feeling of someone touching him, although no one was in his room. (Tr. 396). Plaintiff denied any symptoms of mania, hypomania, suicidal ideation, or homicidal ideation, but told Dr. Vansickle that he was having thoughts of wanting to kill himself and had a plan to "slice his wrists." (Tr. 396, 402).

Dr. Vansickle noted that this was Plaintiff's fifth inpatient psychiatric admission. (Tr. 399). Plaintiff tested negative for any drug use but admitted to using cannabis semi-regularly. (Tr. 400). Plaintiff was prescribed Zyprexa, Risperdal, Topamax, and Trazadone. (Tr. 401). After beginning the medicine, Plaintiff stated that his paranoia had improved and that he had only awakened once during the night. (Tr. 396-97). Upon discharge, Plaintiff denied all psychosis or suicidal ideation, and he appeared stable, logical, goal directed, and coherent (Tr. 396-97).

Plaintiff returned to SouthEast Health in March 2020 with complaints of dizziness and lightheadedness. (Tr. 414). Although Plaintiff denied any drug use, he tested positive for amphetamines and cocaine. (Tr. 414, 420). He stated that he drank a lot of beer the day before. (Tr. 414). Plaintiff was discharged with a prescription for promethazine to take every six hours. (Tr. 413). Notably, the records from this visit do not show any complaints or symptoms of mental disorders. (Tr. 412-23).

In August 2020, Plaintiff reported to Dr. Srikanth Challagundla at SouthEast Health with suicidal and homicidal ideation, paranoia, and a plan to kill himself. (Tr. 435). Plaintiff stated that he believed somebody was living in his mother's attic and following him wherever he went. (Tr. 435). He also expressed that he wanted to kill his mother. (Tr. 435). He admitted to having used Ecstasy four days before but denied any other drug use, although he tested positive for amphetamines and THC. (Tr. 435). Dr. Challagundla admitted Plaintiff to the hospital and prescribed him Haldol, Seroquel, and Congentin. (Tr. 441). Within three days of starting the

medicine, Dr. Challagundla noted that Plaintiff's symptoms had improved and that he appeared pleasant, calm, and cooperative. (Tr. 436). Each day that Plaintiff was on his medication, records show that his attention and concentration, fund of knowledge, and insight and judgment improved. (Tr. 453, 461, 465, 473). Plaintiff was noted to be pleasant, cooperative, and engaged in group activities. (Tr. 435-36). Upon discharge, Plaintiff was excited to attend a group home, motivated to abstain from illicit drugs, and denied any symptoms suggestive of psychosis, including auditory, visual, or tactile hallucinations and paranoia. (Tr. 435).

In an individual assessment with Dr. Fernando Lopez in September 2020, Plaintiff had clear speech, appropriate thoughts, and good judgment. (Tr. 633-35). Dr. Lopez noted that Plaintiff's concentration was intact, that he had appropriate mood, and that he had no problems with recent or remote memory. (Tr. 635). Additionally, Dr. Lopez's records show that Plaintiff's schizophrenia, stimulant dependence, and cannabis dependence were stable. (Tr. 635). In December 2020, Dr. Lopez conducted a second individual examination of Plaintiff. (Tr. 802). Once again, Plaintiff was noted to have clear speech, good judgment, and appropriate thoughts, mood, and affect. (Tr. 803-04).

Between 2020 to February 2021, Plaintiff was seen at SpectraCare Health for both outpatient and inpatient mental health treatment. (Tr. 498-884). In his consultative session, it was noted that Plaintiff's presenting complaint was the "[d]isability judge told him to come." (Tr. 499). Briana Grayson found that Plaintiff did not appear to be suffering from any paranoia related to a mental disorder. And, although Plaintiff complained of paranoia, delusional thinking, and hallucinations, Grayson noted that Plaintiff's mental status appeared normal, his mood and affect were appropriate, and his self-concept was realistic. (Tr. 499, 506-07, 520). Plaintiff began attending group therapy sessions at SpectraCare and it was repeatedly noted that he was stable and

active in discussion, even sometimes showing leadership and offering insight. (Tr. 524-45, 551-64, 567-89, 594-602, 610, 638-755). During individual sessions, Plaintiff shared that his medications were working, and that he noticed less paranoia and no hallucinations. (Tr. 624).

During his inpatient treatment, Plaintiff lived in a group home in Midland City, Alabama. (Tr. 55). Individuals in the group home were required to follow a structured routine. (Tr. 55). Each morning, Plaintiff and the other admittees would wake up, take care of their hygiene, take their medication, and clean their homes. (Tr. 55). The women in the group home were in charge of all cooking, while the men washed the dishes. (Tr. 55). According to Plaintiff, the group home had scheduled events every day from 9:00 a.m. to 4:00 p.m. that were "something like school." (Tr. 55).

Dr. Randy Jordan conducted a psychiatric examination of Plaintiff in August 2021. (Tr. 886-88). Dr. Jordan noted that Plaintiff appeared neatly groomed, had good hygiene, and had a friendly and appropriate mood for the situation. (Tr. 887). Plaintiff was able to do serial sevens, spell the word "gold" backwards, repeat five-digits forward and three-digits backwards, and relay relevant information that showed an intact long-term memory. (Tr. 887). Dr. Jordan estimated that Plaintiff's intelligence level was in the "Low Average" range. (Tr. 887). Although Plaintiff complained of suffering from paranoid delusions and auditory hallucinations when he was not on his medications, Dr. Jordan recorded that Plaintiff's thought process revealed no loose associations or tangential thoughts, that he did not currently have homicidal or suicidal ideations, and that his judgment did not seem compromised. (Tr. 887) Further, Dr. Jordan opined that Plaintiff's psychiatric function did not interfere with his ability to conduct daily tasks such as cleaning, cooking light meals, or grooming himself. (Tr. 887). Plaintiff informed Dr. Jordan that his psychotropic medications were extremely helpful for his mood swings and hallucinations, but that

he had run out of them and did not have the income to obtain more. (Tr. 886). Ultimately, Dr. Jordan found that Plaintiff had an unlimited ability to manage basic self-care, carry out simple one-to-two step commands, sustain a work routine without the need for special supervision, and manage his finances reliably and independently. (Tr. 888). Dr. Jordan found that Plaintiff was mildly limited in his ability to maintain attention and concentration for at least two hours and maintain acceptable appearance, behavior, and social interaction. (Tr. 888). However, Dr. Jordan noted that Plaintiff was moderately limited in his ability to seek and accept supervision or instruction. (Tr. 888). Finally, Dr. Jordan opined that, so long as Plaintiff was properly taking his medications, he had an unlimited ability to maintain a regular schedule and be punctual, as well as a mildly limited ability to maintain a regular work schedule without missing more than two days. (Tr. 888).

Dr. Joan Joynson conducted a psychological review of Plaintiff in September 2021. Dr. Joynson noted that, based on Plaintiff's medical and therapy records, his mood can be stable for months at a time and that he is capable of appropriately interacting with others. (Tr. 889). Dr. Joynson found that Plaintiff had severe dependencies on cannabis and methamphetamine, which can cause paranoia and feelings of persecution. (Tr. 889). Indeed, Dr. Joynson noted that Plaintiff's reports of paranoia were usually associated with substance abuse; however, he responded well to his medications and his symptoms usually resolved with detox from illegal substances and proper medication usage. (Tr. 889-90). According to Dr. Joynson, Plaintiff's ability to relate to others is without limitation. (Tr. 890). Ultimately, Dr. Joynson concluded that, in the absence of substance abuse, Plaintiff can follow simple one-to-two step instructions, maintain a regular schedule, have routine superficial work interactions, and adequately respond to supervision and coworkers. (Tr. 890). However, Dr. Joynson believed that Plaintiff is better suited for work in a setting with lower

8

amounts of public contact and routine superficial work-related interactions. (Tr. 890).

In October 2021, Plaintiff underwent a consultative physical examination with Nurse Practitioner James Nolin. (Tr. 896). Nurse Practitioner Nolin recorded that Plaintiff was alert and oriented, despite his complaints that he "feels he is in between 2 dimensions and see[s] other things that other people do not." (Tr. 896-97). Plaintiff had 5/5 strength in all extremities; normal reflexes; no difficulty walking, squatting, rising, or getting on and off the examination table; and complete range of motion. (Tr. 898-900). Nolin opined that Plaintiff had no limitations standing, walking, or sitting, and that he could frequently carry, climb, balance, stoop, kneel, crawl, and push/pull. (Tr. 901-02).

Dr. Yamir Laboy, a state agency psychological consultant, conducted a psychiatric review of Plaintiff in October 2021. (Tr. 138-147). Dr. Laboy opined that Plaintiff had severe impairments of schizophrenia, personality disorder, and trauma/stressor related disorders, as well as non-severe impairments of hypertension and substance abuse disorders. (Tr. 141). Further, Dr. Laboy recorded that Plaintiff had moderate limitations in interacting with others and adapting or managing himself, and mild limitations in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. (Tr. 142). Ultimately, Dr. Laboy found that the evidence in Plaintiff's file supports the following findings: he can perform simple routine tasks and have routine superficial work interactions; he is able to adequately respond to supervision and coworkers but is better suited for work settings with lower public contact and routine work-related superficial interactions; and he is able to adapt to workplace changes for work settings involving simple routine tasks. (Tr. 142). According to Dr. Laboy, Plaintiff can sustain attention to routine, familiar tasks for two-hour periods in an eight-hour workday, utilizing all customary breaks. (Tr. 144). Finally, Dr. Laboy opined that Plaintiff's psychiatric issues may limit his persistence, pace,

and task completion at times, but that he should be able to complete simple tasks within a reasonable time frame. (Tr. 144).

In November 2021, Plaintiff reported to the emergency room with complaints of suicidal ideation and auditory hallucinations. (Tr. 904-05). Plaintiff denied drug or alcohol abuse. (Tr. 904). He stated he had been off his medication for about six months. (Tr. 907). During his initial examination, Plaintiff showed signs of agitation and anger, but he was cooperative. (Tr. 905-06, 936, 939, 951). He was prescribed Risperdal and Seroquel and noted to have a good response to the medicines. (Tr. 911). Plaintiff complained that his heart was beating too fast and was administered Cardizem and Ativan. (Tr. 940). At discharge, Plaintiff was noted to be calm, cooperative, and pleasant, with a logical thought process and intact judgment. (Tr. 911). Although Plaintiff admitted to still having some auditory hallucinations, he denied any suicidal or homicidal ideations, as well as any psychotic symptoms of delusions or hallucinations. (Tr. 911). He was instructed to continue taking his medications and discharged to a group rehabilitation home. (Tr. 912, 914, 958-59).

Less than two weeks later, Plaintiff returned to the emergency room with complaints of suicidal ideations and paranoia and was evaluated by Nurse Practitioner Christopher L. Surratt. (Tr. 980, 1007). Plaintiff admitted to having drank a twelve-pack of beer earlier that day. (Tr. 980, 984). Plaintiff told Surratt that he had recently tried to commit suicide by overdosing on four Tylenol tablets about two weeks ago, and that he currently wanted to die but did not have a plan. (Tr. 980). Plaintiff complained of feeling like people were trying to kill him and having auditory hallucinations where "death" was talking to him. (Tr. 980). Further evaluations revealed that Plaintiff was diaphoretic, had tremors, and was hypertensive. (Tr. 980). Plaintiff informed the doctors examining him that he was currently taking the Invega injection, but that it had not helped

his hallucinations or paranoia. (Tr. 984).

Although Plaintiff denied drug use, he tested positive for amphetamines; he stated that he believed he was drugged by one of his friends. (Tr. 984-85, 987). He was also noted to show signs of acute alcohol withdrawal. (Tr. 1016). Plaintiff was given another dosage of Invega and restarted on Zoloft. (Tr. 992). After beginning the medication, Plaintiff's suicidal thoughts subsided, and his psychotic symptoms diminished. (Tr. 992). Medical records show that Plaintiff's thought process was organized and concrete, that he was calm and coherent, and that his concentration and attention span were good. (Tr. 993). Upon discharge, Plaintiff denied any suicidal or homicidal ideation, hallucinations, or paranoia. (Tr. 992).

On July 29, 2022, Dr. Michael E. Anderson conducted a psychiatric evaluation of Plaintiff. (Tr. 1049). Plaintiff admitted that he had been out of his medications for a while and had been unable to get them. (Tr. 1050). He told Dr. Anderson that his sister urged him to get back on his medications because he had been scared and paranoid. (Tr. 1050). Dr. Anderson recorded that Plaintiff admitted to some suicidal thoughts, auditory hallucinations, visual hallucinations, and substance abuse (including marijuana and methamphetamine). (Tr. 1050). Dr. Anderson noted that Plaintiff's speech was pressured and loud, that he held intense eye contact, that he appeared agitated and restless, and that his mood seemed anxious and irritable. (Tr. 1052). Although Dr. Anderson recorded that Plaintiff's thought content was paranoid and bizarre, it was also found that Plaintiff's thoughts and association were tangential and that he had fair insight and judgment. (Tr. 1052). Further, Plaintiff's memory was intact, and his attention and control were deemed to be fair. (Tr. 1052). Dr. Anderson opined that Plaintiff had minimal compliance with his prescribed medications, despite him having strong access to care. (Tr. 1052-53). Ultimately, Dr. Anderson recommended that Plaintiff be admitted to an inpatient psychiatric unit for at least a week to re-

11

introduce him to medication. (Tr. 1053-54).

## II.    ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572.  "Substantial" work activity is work that involves doing significant physical or mental activities.  *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both criteria, then the claimant cannot claim disability.  *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  *Id.* § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability. *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See id.* §§ 404.1520(d), 404.1525, and 404.1526.   If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite his impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.  *Id.* § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past

relevant work, then the analysis proceeds to the fifth and final step. *Id.* § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

The ALJ found that Plaintiff has not engaged in substantial gainful activity since before June 27, 2020, and that he met the insured status requirements of the Act through March 31, 2022. (Tr. 20). Based upon the medical evidence presented, the ALJ concluded that Plaintiff has the following severe impairments: bipolar disorder; schizoaffective disorder; and substance abuse. (Tr. 20). Nevertheless, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20).

Next, the ALJ evaluated Plaintiff's testimony and found that Plaintiff's descriptions of the intensity, persistence, and limiting effects of his symptoms were inconsistent with the objective medical evidence and other evidence in the record. (Tr. 22). After consideration of the entire record, the ALJ determined that Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) with the following limitations: he is limited to simple, routine, repetitive tasks involving only simple work-related decisions; he is limited to few, if any, workplace changes; and he is limited to occasional interactions with the public, coworkers, and supervisors. (Tr. 22).

Based on this RFC, the ALJ concluded that Plaintiff is unable to perform any past relevant work and that transferability of job skills is not material to the determination of disability. (Tr. 27);

13

*see* 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 82-41. Yet, the ALJ further found that there are a significant number of jobs in the national economy that Plaintiff can perform when considering his age, education, work experience, and RFC. (Tr. 28). Therefore, the ALJ ruled that Plaintiff is not disabled as that term is defined in the Act, and, therefore, is not entitled to a period of disability, DIB, or SSI. (Tr. 29).

## III.   Plaintiff's Argument for Remand

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, remanded for reconsideration. (Pl.'s Mem., Doc. # 8 at 16). Plaintiff argues that remand is appropriate because: (1) the ALJ's findings of Plaintiff's RFC are inconsistent with the medical opinions he found persuasive; (2) the ALJ failed to address the possibility of "good days" and "bad days" when considering his mental impairments; and (3) the ALJ failed to provide the VE with a complete picture of his impairments and the effect such impairments have on his ability to perform basic work activities. (Pl.'s Mem., Doc. # 8 at 9, 12, 15).

## IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision

is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

Plaintiff advances three arguments for why remand is appropriate. First, Plaintiff argues that his RFC is inconsistent with the medical opinions that the ALJ found to be persuasive. (Pl.'s Mem., Doc. # 8 at 9). Second, Plaintiff argues that the ALJ erred in failing to consider the possibility of "good days" and "bad days" when evaluating his mental impairments. (Pl.'s Mem., Doc. # 8 at 12). Finally, Plaintiff believes that remand is appropriate because the ALJ failed to provide the VE with a complete picture of his impairments during questioning. (Pl's Mem., Doc. # 8 at 15). After careful review, the court concludes that the ALJ's decision is supported by substantial evidence and that the ALJ correctly applied the law.

### A.   The ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

A claimant's RFC is an assessment of the claimant's ability to do work despite his impairments. *Matos v. Comm'r of Soc. Sec.*, 2022 WL 97144, at *5 (11th Cir. 2022) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(a)). In formulating an

RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). To do this, the ALJ examines all relevant medical and other evidence, including "any statements about what [the claimant] can still do that have been provided by medical sources," as well as "descriptions and observations" by the claimant, his family, his neighbors, his friends, or others, of his limitations, including limitations resulting from pain. *Matos*, 2022 WL 97144 at *5; 20 C.F.R. § 404.1545(a)(3).

Plaintiff argues that remand is appropriate because, although the ALJ specifically found the medical opinions of Dr. Randy Jordan and Dr. Yamir Laboy to be persuasive, the RFC findings differed from some of their conclusions. However, this argument erroneously equates the term "persuasive" as synonymous with "controlling." Those terms are not the same. Indeed, numerous courts have held that an ALJ's reference to an opinion as persuasive does not make it binding, and that the regulations do not require an ALJ to adopt every part of an opinion he finds persuasive into an RFC. *See Sanders v. Comm'r of Soc. Sec.*, 2022 WL 970181, at *5 (M.D. Fla. 2022); *Freyhagen v. Comm'r of Soc. Sec.*, 2019 WL 4686800, at *8 (M.D. Fla. 2019); 20 C.F.R. § 416.920(c). Rather, "the assessment of a claimant's RFC is within the exclusive province of the ALJ." *Sanders*, 2022 WL 970181 at *5 (citing 20 C.F.R. § 416.946(c)); *see also Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

Indeed, our own circuit has made this abundantly clear. *See Matos*, 2022 WL 97144 at *6. In *Matos*, the Eleventh Circuit held that an ALJ's RFC determination is proper so long as it is supported by substantial evidence, even if it ultimately differs from the conclusions of a medical opinion the ALJ referred to as persuasive. *Id.* Therefore, even if the RFC in this case differs from

the medical opinions of Dr. Jordan and Dr. Laboy, it is nonetheless proper so long as it is supported by substantial evidence. The court considers each doctor's opinion, in turn.

### 1.    Dr. Randy Jordan

Dr. Randy Jordan conducted a psychiatric examination of Plaintiff in August 2021. (Tr. 886-88). At the time of his examination with Dr. Jordan, Plaintiff was not taking his prescribed medications; instead, he informed Dr. Jordan that his psychotropic medications were extremely helpful for his mood swings and hallucinations, but that he had run out of them and did not have the funds to obtain more. (Tr. 886). Dr. Jordan's examination notes show that Plaintiff appeared neatly groomed, had good hygiene, and had a friendly and appropriate mood for the situation. (Tr. 887). Plaintiff was able to do serial sevens, spell the word "gold" backwards, repeat five-digits forward and three-digits backwards, and relay relevant information to show an intact long-term memory. (*Id*.). Plaintiff complained of suffering from paranoid delusions and auditory hallucinations when he was not on his medications, but Dr. Jordan recorded that, even though Plaintiff was not taking his medication at that time, his thought process revealed no loose associations or tangential thoughts, he did not currently have homicidal or suicidal ideations, and his judgment did not seem compromised. (*Id*.). Notably, Dr. Jordan found that Plaintiff's psychiatric function did not interfere with his ability to conduct daily tasks such as cleaning, cooking light meals, or grooming himself. (*Id*.).

Ultimately, Dr. Jordan opined that Plaintiff had an unlimited ability to manage basic self-care, carry out simple one-to-two step commands, sustain a work routine without the need for special supervision, and manage his finances reliably and independently. (Tr. 888). Dr. Jordan found that Plaintiff was mildly limited in his ability to maintain attention and concentration for at least two hours and maintain acceptable appearance, behavior, and social interaction. (*Id*.). However, Dr. Jordan noted that Plaintiff was moderately limited in his ability to seek and accept

supervision or instruction. (*Id.*). Finally, Dr. Jordan opined that, so long as Plaintiff was properly

taking his medications, he had an unlimited ability to maintain a regular schedule and be punctual,

as well as a mildly limited ability to maintain a regular work schedule without missing more than

two days. (*Id.*). Dr. Jordan concluded his opinion by stating that Plaintiff "has no means to get

meds which seem to make a large difference for him…probably the difference between being able

to work or not." (*Id.*).

The ALJ evaluated Dr. Jordan's medical opinion and found it to be persuasive.

Specifically, the ALJ noted:

> After the comprehensive mental status evaluation, Dr. Jordan gave the opinion that
> [Plaintiff] was moderately limited in his ability to seek and accept supervision and
> instructions and mildly limited in his ability to maintain acceptable appearance,
> behavior, and social interaction, maintain a regular work schedule without missing
> more than two days due to his psychological symptoms, and maintain attention,
> concentration, and pace for at least two hours. (Exhibit C7F). Dr. Jordan assessed
> [Plaintiff] with no limitation managing basic self-care, understanding and carrying
> out simple one to two step commands, maintaining a regular work schedule and be
> punctual, sustaining routine work without the need for special supervision, and
> managing finances reliably and independently. The undersigned finds that Dr.
> Jordan's opinion is persuasive as his opinion is consistent with and supported by
> objective evidence showing adequate grooming and hygiene, with stable affect,
> intact concentration, intact long-term memory, fair judgment, and below average to
> average fund of knowledge.

(Tr. 26). After making this finding and considering the other medical opinions and evidence in the

record, the ALJ arrived at the following RFC:

> [Plaintiff] has the residual functional capacity to perform medium work as defined
> in 20 C.F.R. [§§] 404.1567(c) and 416.967(c) except [Plaintiff] is limited to simple
> routine repetitive task involving only simple work-related decisions; few, if any,
> workplace changes; and occasional interactions with the public, coworkers, and
> supervisors.

(Tr. 22).

Plaintiff argues that remand is appropriate because, although the ALJ found Dr. Jordan's

opinion about his ability to maintain a regular work schedule to be persuasive, the RFC did not

18

include Dr. Jordan's limitation that Plaintiff's ability to do so was contingent on him properly taking his medication. (Pl.'s Mem., Doc. # 8 at 10). And, because Dr. Jordan noted that Plaintiff "has no means to get meds which seem to make a large difference for him," Dr. Jordan made clear that this would probably be the difference in Plaintiff being able to work or not. (Tr. 888). Therefore, Plaintiff argues that the ALJ erred in finding that he was able to maintain a regular work schedule but not including Dr. Jordan's limitation that he could only do so if he had the financial means to access his medicine. This argument misses the mark.

As an initial matter, Dr. Jordan's conclusion that Plaintiff would only be able to regularly work if he had access to his medication is not a medical opinion, but instead a statement on an issue expressly reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i) (including statements about whether a claimant is disabled, able to work, or able to perform regular or continuing work as issues reserved to the Commissioner). For example, in *Stokes v. Kijakazi*, a court in this circuit found that a doctor's observation that the plaintiff could only work if he was correctly taking his prescription medication was "fairly characterized as an opinion about the [p]laintiff's ability to engage in substantial gainful activity, and the ALJ thus did not err by declining to address that statement." 2022 WL 950654, at *5 (M.D. Fla. 2022). Here, Dr. Jordan's statement that Plaintiff could only maintain a regular work schedule if he was properly taking his medication is no different. Therefore, Dr. Jordan's statement on this issue is fairly characterized as an opinion about Plaintiff's ability to engage in substantial gainful activity, and the ALJ did not err by declining to address that statement. *Id.* at *5.

Further, even if the court were to find that Dr. Jordan's observation that Plaintiff can only maintain a regular schedule if he is on medication *was* a valid medical opinion (and, to be clear, the court finds it is not), the ALJ did not err in omitting it from his RFC determination. The ALJ

stated that he fully considered all medical opinions and prior administrative medical findings when evaluating Plaintiff's claims and his RFC. (Tr. 25). And, although Plaintiff argues that the ALJ erred because the RFC did not include Dr. Jordan's limitation that he could only follow a regular work schedule if he was properly taking his medication, substantial evidence supports the ALJ's finding to the contrary.

First, substantial evidence supports the ALJ's finding that Plaintiff can follow a regular work schedule. Even when Plaintiff was not taking his medication, Dr. Jordan observed that he appeared neatly groomed, had good hygiene, and had a friendly and appropriate mood for the situation, and that he was able to do serial sevens, spell the word "gold" backwards, repeat five-digits forward and three-digits backwards, and relay relevant information to show an intact long-term memory. (Tr. 887). Notably, Dr. Jordan found that Plaintiff's psychiatric function did not interfere with his ability to conduct daily tasks such as cleaning, cooking light meals, or grooming himself. (Tr. 887). Similarly, Dr. Joynson concluded that, in the absence of using illegal substances, Plaintiff can follow simple one-to-two step instructions, maintain a regular schedule, have routine superficial work interactions, and adequately respond to supervision and coworkers. (Tr. 890).

The non-medical evidence in the record supports these findings as well. Plaintiff successfully attended over seventy group therapy sessions between September 3, 2020 and December 21, 2020, and it was repeatedly noted that he was stable and active in discussion, and even showed leadership and offered insights. (Pl.'s Br., Doc. # 8 at 4; Tr. 524-45, 551-64, 567-89, 594-602, 610, 638-755). During his inpatient stay at SpectraCare, Plaintiff followed a schedule from 9:00 a.m. to 4:00 p.m. each day, and that was in addition to performing mandatory chores in the group home. (Tr. 55). And, Plaintiff himself testified that he has handled daily tasks around his

father's house, such as washing dishes, doing laundry, feeding the dogs, and cooking meals. (Tr. 48-49, 324). All of this evidence, taken together, is substantial evidence that Plaintiff is capable of following a regular schedule.

And, contrary to Plaintiff's contentions otherwise, the ALJ did not err in omitting Dr. Jordan's opinion that Plaintiff's ability to work was contingent on him having the financial means to access his medication from the RFC. In *Ellison v. Barnhart*, the Eleventh Circuit made clear that an ALJ's failure to consider a claimant's ability to afford medication is not reversible error, so long as the ALJ does not specifically base his decision on the claimant's non-compliance. 355 F.3d 1272, 1275 (11th Cir. 2003). As stated above, the ALJ's opinion was not specifically based upon Plaintiff's non-compliance with his medication, but instead on the numerous medical reports, therapy notes, and Plaintiff's own testimony proving his ability to work. But, in any event, the ALJ *did* consider Plaintiff's ability to afford his medication. (Tr. 25). As the ALJ noted, although Plaintiff contends that he is unable to afford his medications, he purchases cigarettes regularly, averaging almost a pack a day. (Tr. 25, 48). He testified that his brother gives him money so that he can buy cigarettes and that his father "helps [him] out." (Tr. 48). He receives $350 a month in food stamps and lives with his father. (Tr. 48). His family is supportive of his treatment, evidenced by his sister encouraging him to make an appointment with a doctor to get back on medication. (Tr. 1050). And, during Plaintiff's psychiatric evaluation, Dr. Anderson noted that one of Plaintiff's strengths was his access to care. (Tr. 1053). All of this evidence supports an inference that Plaintiff can afford to pick up his prescriptions. Again, however, as discussed above, the ALJ did not base his disability finding on Plaintiff's noncompliance with his medication, but instead on substantial evidence in the record that supports a finding that Plaintiff can engage in substantial gainful activity. Therefore, this is not reversible error.

Ultimately, the assessment of a claimant's RFC is within the exclusive province of the ALJ. *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012). As the Eleventh Circuit has made clear, an ALJ's RFC determination is proper -- even if it ultimately differs from the conclusions of a medical opinion the ALJ refers to as persuasive -- if it is supported by substantial evidence. *Matos*, 2022 WL 97144 at *6. Based on the foregoing, the court finds that substantial evidence supports the ALJ's RFC determination, and the ALJ did not err in excluding some of Dr. Jordan's limitations from the RFC.

### 2.    Dr. Yamir Laboy

Dr. Yamir Laboy conducted a psychiatric review of Plaintiff in October 2021. (Tr. 138-47). Dr. Laboy opined that Plaintiff had severe impairments of schizophrenia, personality disorder, and trauma/stressor related disorders, as well as non-severe impairments of hypertension and substance abuse disorders. (Tr. 141). Further, Dr. Laboy recorded that Plaintiff had moderate limitations in interacting with others and adapting or managing himself, and mild limitations in understanding, remembering, applying information, concentrating, persisting, and maintaining pace. (Tr. 142). Ultimately, Dr. Laboy found that the evidence in Plaintiff's file supports the following findings: he can perform simple routine tasks and have routine superficial work interactions; he is able to adequately respond to supervision and coworkers but is better suited for work settings with lower public contact and routine work-related superficial interactions; and he is able to adapt to workplace changes for work settings involving simple routine tasks. (Tr. 142). According to Dr. Laboy, Plaintiff can sustain attention to routine, familiar tasks for two-hour periods in an eight-hour workday, utilizing all customary breaks. (Tr. 144). Finally, Dr. Laboy opined that Plaintiff's psychiatric issues may limit his persistence, pace, and task completion at times, but that he should be able to complete simple tasks within a reasonable time frame. (Tr.

144).

The ALJ examined Dr. Laboy's opinion and found it to be persuasive:

> Yamir Laboy, Psy.D., a State agency psychological consultant, submitted a psychiatric review technique form wherein he rated [Plaintiff]'s "B" criteria in relation to schizophrenia spectrum and other psychotic disorders, personality disorders, substance addiction disorders, and trauma and stressor-related disorders (Exhibits C11A and C12A). He assessed [Plaintiff] as experiencing a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a moderate limitation adapting or managing oneself. Dr. Laboy gave the opinion that [Plaintiff] is capable of performing simple routine tasks, having routine superficial work interactions. [Plaintiff] is able to adequately respond to supervision and coworkers; however, he is better suited for work settings having lower public contact and routine superficial work related interactions. [Plaintiff] is able to adapt to workplace changes for work settings involving simple routine tasks. The undersigned finds that Dr. Laboy's opinion is persuasive as his opinion is consistent with and supported by the objective evidence. Records indicate that [Plaintiff] has a significant history of substance abuse with psychosis and depression. However, with detoxification and medication, [Plaintiff] was stable and reported no paranoia or hallucinations. Further, Dr. Laboy's opinion is consistent with mental status evaluations showing adequate attention, memory, and judgment.

(Tr. 26). Plaintiff argues that, even though the ALJ found Dr. Laboy's opinion to be persuasive, the RFC omits portions of Dr. Laboy's findings. As a result, Plaintiff asserts that remand is appropriate for three reasons.

First, Plaintiff argues that remand is appropriate because the RFC did not include Dr. Laboy's finding that Plaintiff can sustain attention to routine, familiar tasks for only two-hour periods in an eight-hour workday. (Pl.'s Br., Doc. # 8 at 11). Instead, the RFC limited Plaintiff to simple routine repetitive tasks involving only simple work-related decisions. (Tr. 22). However, as other courts have pointed out, this argument misinterprets the language used in the social security context to describe a typical workday:

> According to the Commissioner's regulations, it is assumed that most jobs permit a morning, lunch, and afternoon break, in roughly two-hour intervals, and the two-hour block qualifier is simply a reminder that substantial gainful activity does not

> require constant concentration and persistence without interruption throughout the entire workday. To the Commissioner, a notation about two-hour blocks is simply a term of art, or shorthand reference, to a basic presupposition inherent in the concentration, persistence, and pace analysis … This is borne out by the Administration's Program Operations Manual … which instructs administrative claims adjudicators, when considering "stamina" for substantial gainful activity, to "[c]onsider an 8-hour workday and a 5 day work week (with normal breaks, e.g., lunch, morning, and afternoon breaks) in evaluating the ability to sustain work-related functions." POMS § DI 24510.005(C)(2)(b). Similarly, the Manual explains in relation to mental limitations that the "mental abilities needed for any job" include the ability to understand, remember, and carry out simple instructions by … maintaining concentration and attention "for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." POMS § DI 25020.010(B)(2)(a).

*Baker v. Social Sec. Admin. Comm'r*, 2011 WL 1298694, at *4 (D. Me. 2011). Therefore, a doctor's opinion that a claimant can maintain concentration for two-hour blocks is the equivalent of finding that the claimant can "concentrate on and persist with simple tasks all day, five days per week, understanding that there will be regular breaks." *Id.*; *see also Degraffenreid v. Colvin*, 2016 WL 5109509, at *7 (D. Mass. 2016) (finding the same). As a result, there was no need for the ALJ to include the 2-hour limitation language in the RFC, and he did not err by not doing so.

Second, Plaintiff contends that the ALJ erred by not including Dr. Laboy's conclusion that Plaintiff will be limited in his pace, persistence, and concentration in the RFC. But, the ALJ *did* include this limitation in the RFC. The RFC limited Plaintiff to "simple routine repetitive task[s] involving only simple work-related decisions." (Tr. 22). The Eleventh Circuit has made clear that an ALJ accounts for a claimant's limitations in concentration, persistence, and pace by limiting him to simple, routine, and repetitive tasks. *Duval v. Comm'r of Soc. Sec.*, 628 F. App'x 703, 712-13 (11th Cir. 2015) ("[T]he ALJ accounted for [plaintiff's] moderate limitations in concentration, persistence, or pace by limiting him to simple, routine, and repetitive tasks, which medical evidence showed he could perform."). Therefore, this argument is without merit.

Finally, Plaintiff points out that Dr. Laboy found Dr. Jordan's opinion was "generally supportable by and consistent with other evidence in [Plaintiff's] file." (Pl.'s Br., Doc. # 8 at 11; Tr. 143). Plaintiff contends that this necessarily includes Dr. Jordan's finding that his inability to get medicine is the difference between him being able to work or not. (Pl.'s Br., Doc. # 8 at 11). Therefore, Plaintiff argues (again) that the ALJ erred by failing to include his inability to afford his medication in his RFC findings. But, as discussed above, the ALJ analyzed Plaintiff's ability to afford his medication in the opinion and did not base his finding only on his noncompliance with his medicine. Rather, the ALJ focused on the record evidence about Plaintiff's capability to work. *Ellison*, 355 F.3d at 1275.

Therefore, the court finds that substantial evidence supports the ALJ's RFC determination, and the ALJ did not err in excluding some of Dr. Laboy's limitations from Plaintiff's RFC.

### B.   The ALJ considered Plaintiff's good days and bad days when formulating his RFC.

As the Eleventh Circuit noted in one of its decisions, "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Schinck v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1267-68 (11th Cir. 2019) (quoting *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)). In situations where this is the case, the fact that a claimant may have bad days must be considered when determining whether a claimant's mental condition is severe. *Id.* Therefore, although "symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim." *Id.* (quoting *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986)). Plaintiff argues that remand is appropriate here because the ALJ did not consider the possibility of absenteeism or time off of tasks at work during Plaintiff's "bad days" with his mental illness. The court disagrees.

It is clear from the ALJ's decision that he considered Plaintiff's bad days when formulating Plaintiff's RFC. The ALJ's decision walks through each time Plaintiff reported to a hospital with reports of paranoia or hearing voices. (Tr. 23-25). Notably, these visits evidence the ups and downs of Plaintiff's mental health, with some showing Plaintiff having an anxious mood and other showing him having a stable mood. (Tr. 23-25). Although the ALJ made clear that Plaintiff's issues with his mental health ebb and flow, the ALJ also highlighted that Plaintiff's symptoms quickly subsided and his mood improved each time he resumed taking medication. (Tr. 23-25). Ultimately, the ALJ found that even though Plaintiff complained of experiencing bad days often, his statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the evidence. (Tr. 26).

Substantial evidence supports this finding. As expected, Plaintiff has far more good days when he takes his medicine as prescribed. Although Plaintiff reported to the hospital often with complaints of paranoia, suicidal thoughts, or hearing voices, these symptoms almost always subsided with the introduction of his medicine. (Tr. 372, 382, 396-97, 436, 889-90, 911). With proper medication management, Plaintiff consistently denied almost all hallucinations, paranoia, suicidal or homicidal ideation, or psychosis. (Tr. 372, 396-97, 435, 624, 911, 992). When he was on medication during his time living in the group home at SpectraCare, Plaintiff not only followed a seven-hour structured schedule each day, but also performed chores as well. (Tr. 55-56). And, during the periods where Plaintiff was taking his medications as prescribed, therapy reports showed that he was interactive with others, and his mood remained stable for substantial periods of time. (Tr. 524-45, 551-64, 567-89, 594-602, 610, 638-755)

But the record also supports a finding that even on the bad days -- *i.e.*, the days Plaintiff is off his medications -- Plaintiff is capable of working. For example, even though Plaintiff was not

taking medication when he was evaluated by Dr. Jordan, Dr. Jordan recorded that Plaintiff's thought process revealed no loose associations or tangential thoughts, he did not currently have homicidal or suicidal ideations, his judgment did not seem compromised, and his psychiatric function did not interfere with his ability to conduct daily tasks such as cleaning, cooking light meals, or grooming himself. (Tr. 887). Notably, Plaintiff was able to do serial sevens, spell the word "gold" backwards, repeat five-digits forward and three-digits backwards, and relay relevant information to show an intact long-term memory. (Tr. 887). Similarly, during his consultative visit for SpectraCare, Plaintiff indicated that he was not taking his medication. (Tr. 499). Despite this, Briana Grayson noted that Plaintiff did not appear to be suffering from paranoia from a mental disorder and that it appeared Plaintiff was seeking an assessment in a possible attempt to add to a lawsuit and his case for social security benefits. (Tr. 499, 520). Although Plaintiff complained of paranoia, delusional thinking, and hallucinations, Grayson noted that Plaintiff's mental status appeared normal, his mood and affect were appropriate, and his self-concept was realistic. (Tr. 506-07). And, Plaintiff himself testified that he performs daily chores, such as taking care of animals, cooking, mowing the yard, and doing laundry. (Tr. 48-49). Notably, he did not limit his ability to do so to only "good" days. (Tr. 48-49).

The ALJ properly considered Plaintiff's bad days, even if he did not accept them as dispositive to the issue of disability in light of the other evidence. The ALJ did not err in this consideration and the ALJ's determination regarding the credibility of Plaintiff's complaints and the nature and frequency of his conditions is supported by substantial evidence.

### C.    The ALJ's hypothetical questions to the Vocational Expert were proper.

Finally, Plaintiff argues that the ALJ failed to provide the VE with a complete picture of his impairments and the effect such impairments would have on his ability to perform basic work

activities. The court disagrees.

At the hearing, the ALJ asked the VE to assume a hypothetical individual of the same age, education, and work experience as Plaintiff who could perform a full range of medium work with the following limitations: the hypothetical individual could only perform work limited to simple, routine, and repetitive tasks involving only simple work-related decisions and few, if any, workplace changes; and the hypothetical individual could only occasionally interact with the public, coworkers, or supervisors. (Tr. 56-57). The VE testified that the hypothetical individual would not be able to perform any of Plaintiff's past work, but that there were sufficient work opportunities for such an individual, such as an industrial cleaner, a kitchen helper, and a laundry worker. (Tr. 57). The ALJ then asked the VE if these jobs would still be available if the hypothetical individual had the same limitations as above but could have no contact with the public. (Tr. 58). The VE noted that, even with the parameters of the hypothetical adjusted to no contact with the public, all of these jobs would remain available. (Tr. 58).

Although Plaintiff argues that the ALJ erred in failing to account for absenteeism or time off task, an ALJ is not required to include limitations in the hypothetical that are unsupported by the record. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Despite Plaintiff's contentions otherwise, Dr. Laboy's statement that "Plaintiff can sustain attention to routine, familiar tasks for two-hour periods in an eight-hour workday, utilizing all customary breaks" (Tr. 144) does not support a finding that Plaintiff will suffer from chronic absenteeism or time off task. In contrast, as discussed above, it is the equivalent of finding that the claimant can "concentrate on and persist with simple tasks all day, five days per week, understanding that there will be regular breaks." *Baker*, 2011 WL 1298694, at *4; *Degraffenreid*, 2016 WL 5109509, at *7. In any event, the hypothetical to the VE accounted for potential time off task by limiting the

hypothetical individual to "simple, routine and repetitive tasks involving only simple work-related decisions." (Tr. 57). *See Duval*, 628 F. App'x at 712-13 ("[T]he ALJ accounted for [plaintiff's] moderate limitations in concentration, persistence, or pace by limiting him to simple, routine, and repetitive tasks, which medical evidence showed he could perform.").

The ALJ's hypothetical also accounted for Plaintiff's severe mental impairments and limitations by restricting him to work that requires attention sufficient to complete simple, routine, and repetitive tasks involving only simple-work related decisions, few (if any) changes, and only occasional interaction with the public, coworkers, or supervisors. (Tr. 57). And, the ALJ further accounted for additional limitations by changing the hypothetical to no contact with the public. (Tr. 58). Under both hypothetical scenarios, the VE determined that sufficient work opportunities existed for such an individual. (Tr. 57-58). The ALJ's hypothetical took into account Plaintiff's impairments and is supported by substantial evidence. *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("In order for a [VE's] testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.").

## VI.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed.  A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this August 8, 2024.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE